**MINCEY FITZPATRICK ROSS, LLC.**          *Attorneys for Plaintiff*

Kevin V. Mincey/Thomas O. Fitzpatrick
PA ID 90201/93204
1650 Market Street
36th Floor
Philadelphia, PA 19103
215-587-0006
kevin@minceyfitzross.com; tom@minceyfitzross.com

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF PENNSYLVANIA

-------------------------------------------------------------X

| | | |
|---|---|---|
| **ANTOINE LIGONS** | : | |
| | : | **JURY TRIAL DEMANDED** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA;** | : | |
| **DETECTIVE MICHAEL GROSS;** | : | |
| **DETECTIVE JOHN HARKINS;** | : | |
| **DETECTIVE HARRY WALTER;** | : | |
| **DETECTIVE LEON LUBIEJEWSKI** | : | |
| **JOHN DOES 1-10** | : | |
| | : | |
| **Defendants** | : | |

-------------------------------------------------------------X

## COMPLAINT

Plaintiff Antoine Ligons ("Mr. Ligons"), by and through his attorneys, brings this action pursuant to 42 U.S.C. § 1983 against Defendants for violations of his constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. In support of this Complaint, Mr. Ligons alleges as follows:

## NATURE OF ACTION

1.      This action seeks monetary damages for the severe constitutional violations Mr. Ligons suffered during a homicide investigation that led to his wrongful conviction and over twenty-six years of imprisonment, including more than twenty years on death row in solitary confinement.

2.      On April 6, 1998, Clarence Johnson was killed during a robbery in West Philadelphia. Mr. Ligons was arrested six days later at age nineteen with no serious criminal record. He was wrongfully convicted and sentenced to death based on fabricated evidence and the suppression of exculpatory evidence by Philadelphia Police Department Homicide Division detectives.

3.      The key evidence against Mr. Ligons consisted of: (a) an alleged eyewitness identification by the victim's wife, Ms. Sonja Johnson; and (b) a purported confession obtained through physical abuse. Both pieces of evidence were the product of constitutional violations by the defendant officers.

4.      Ms. Johnson's identification was fundamentally unreliable because her description of the shooter—a person wearing a ski mask with "light or hazel eyes" who was approximately 5'8" tall—did not match Mr. Ligons, who has dark brown or black eyes and is significantly taller.

5.      More critically, Detective Gross and Detective Walter fabricated evidence and suppressed exculpatory evidence regarding the identification. They testified under oath at trial that they never showed Ms. Johnson photo arrays and that no such arrays existed. This testimony was false. Photo arrays existed in the homicide file and were suppressed from the defense for over a decade.

6.      Mr. Ligons' alleged confession was obtained through physical abuse. He was beaten to the point of requiring medical treatment, with documented injuries including a black eye visible in his booking photograph, orbital contusion, and bruises to his face and neck. Medical records confirm he told hospital staff he was "hit on Friday night"—the same night he was arrested and interrogated.

7.      After over twenty years of wrongful imprisonment and death row confinement, Mr. Ligons was granted a new trial in September 2023 when a

federal court found the Commonwealth had violated Brady v. Maryland by suppressing the photo arrays.

8.      Rather than face retrial with the suppressed evidence now disclosed, Mr. Ligons accepted a guilty plea to third-degree murder on April 9, 2024, and was released on October 8, 2024, after serving 26.5 years in prison for a crime he did not commit.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3) (civil rights jurisdiction).

10.      Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred within the Eastern District of Pennsylvania.

## PARTIES

11.      Plaintiff Antoine Ligons is an individual and citizen of Pennsylvania. At all times relevant to this Complaint, he was a resident of Philadelphia, Pennsylvania.

12.     Defendant City of Philadelphia ("the City") is a municipal corporation organized under the laws of the Commonwealth of Pennsylvania. The City owns, operates, and controls the Philadelphia Police Department ("PPD").

13.     Defendant Detective Jerome Gross was, at all times relevant to this Complaint, employed by the PPD Homicide Division and acting under color of state law. He was the lead detective assigned to investigate the murder of Clarence Johnson.

14.     Defendant Detective Harry Walter was, at all times relevant to this Complaint, employed by the PPD Homicide Division and acting under color of state law. He participated in the investigation of the murder of Clarence Johnson.

15.     Defendant Detective Leon Lubiejewski was, at all times relevant to this Complaint, employed by the PPD Homicide Division and acting under color of state law. He participated in the interrogation of Mr. Ligons and was involved in taking his alleged confession.

16.     Defendants John Does 1-10 are individual police officers and employees of the PPD whose identities are not presently known to Mr. Ligons but who participated in the investigation and prosecution that

violated his constitutional rights. Upon learning their identities, Mr. Ligons will seek leave to amend this Complaint to substitute their real names.

## FACTUAL ALLEGATIONS

### The Crime and Investigation

16.     On April 6, 1998, Clarence Johnson was shot and killed during a robbery while delivering pizza in West Philadelphia.

17.     On April 12, 1998, Mr. Ligons was arrested at his residence at approximately 4:00 p.m. by uniformed patrol officers who testified that nothing was unusual about his appearance when arrested, there was no struggle during the arrest, no force was used, and he was not injured when arrested.

18.     Mr. Ligons was transported to the Police Administration Building ("PAB") and turned over to Homicide Division detectives for questioning at approximately 6:10 p.m.

### The Fabricated and Suppressed Photo Array Evidence

19.     During the investigation, Ms. Sonja Johnson, the victim's wife and the only eyewitness to the murder, was interviewed by Detective Gross and Detective Walter.

20.    Ms. Johnson described the shooter as wearing a ski mask with "light or hazel eyes" and being approximately 5'8" tall. Mr. Ligons has dark brown or black eyes and is significantly taller than 5'8".

21.    Detective Gross and Detective Walter prepared photo arrays containing Mr. Ligons' photograph and showed these arrays to Ms. Johnson during the investigation.

22.    The photo arrays did not contain any indication that Ms. Johnson identified Mr. Ligons. If Ms. Johnson made any identification from the arrays, the evidence suggests she identified someone other than Mr. Ligons.

23.    Despite the existence of these photo arrays in the homicide file, Detective Gross and Detective Walter deliberately concealed their existence from prosecutors and defense attorneys.

24.    At trial on March 18, 1999, Detective Gross testified under oath before the jury that photo arrays were never shown to Ms. Johnson and that no such arrays existed, stating unequivocally: "It didn't happen."

25.    This testimony was false. Detective Gross and Detective Walter knew the photo arrays existed because they were in the homicide file that Detective Gross maintained and controlled.

26.    The false testimony regarding the non-existence of photo arrays

prevented Mr. Ligons' defense counsel from cross-examining Ms. Johnson

about her failure to identify Mr. Ligons from the arrays and from

challenging the reliability of her identification.

27.    The suppression of the photo arrays continued for over a decade after

trial. The Commonwealth denied the existence of the arrays in sworn legal

filings during post-conviction proceedings, even while the evidence was in

the homicide file.

28.    The photo arrays were not disclosed until post-conviction discovery

more than twelve years after trial.

**The Coerced Confession**

29.    After his arrest, Mr. Ligons was interrogated by Detective Gross,

Detective Lubiejewski, and other officers at the PAB.

30.    During the interrogation, Detective Gross, Detective Lubiejewski, and

other officers physically abused Mr. Ligons to coerce him to confess to the

murder.

31.    The physical abuse was so severe that Mr. Ligons required medical

treatment. He sustained a black eye, left orbital contusion, and bruises to his

face and neck.

32.     Mr. Ligons' injuries are documented in: (a) his booking photograph, which shows a visible black eye; (b) medical records from Episcopal Hospital where he was treated on April 13, 1998; and (c) intake records from the Curran-Fromhold Correctional Facility noting "contusion periorbit" and "BRUISES FACE/NECK."

33.     Medical records from Episcopal Hospital confirm that Mr. Ligons told medical staff he was "hit on Friday night"—the same night he was arrested and interrogated.

34.     The arresting officers testified that Mr. Ligons had no visible injuries when arrested, confirming that the injuries occurred during his interrogation by the homicide detectives.

35.     Any statements Mr. Ligons made during the interrogation were the product of physical coercion and were therefore involuntary and obtained in violation of his constitutional rights.

**The Wrongful Conviction and Imprisonment**

36.     Based on the fabricated evidence and the suppression of exculpatory evidence by Detective Gross and Detective Walter, Mr. Ligons was convicted of first-degree murder and sentenced to death in March 1999.

37.    Mr. Ligons spent over twenty years on death row in the Restricted Housing Unit (RHU) in conditions of solitary confinement, locked down twenty-three hours per day.

38.    From 1999 to approximately 2018-2019, death row conditions involved severe isolation, limited human contact, degrading treatment, and unnecessarily restrictive conditions that caused lasting psychological trauma.

39.    During his imprisonment, Mr. Ligons was subjected to assault by other inmates and degrading treatment by guards while being denied meaningful opportunities for rehabilitation or human contact.

40.    In 2021, Mr. Ligons' death sentence was commuted to life imprisonment, but he remained incarcerated.

**The Brady Violation Discovery and Federal Court Relief**

41.    In September 2023, the United States District Court for the Eastern District of Pennsylvania granted Mr. Ligons' petition for writ of habeas corpus, finding that the Commonwealth violated Brady v. Maryland by suppressing the photo arrays.

42.    The federal court found that the Commonwealth's suppression of the photo arrays undermined confidence in the outcome of the trial and that the state court's denial of relief was contrary to clearly established federal law.

43.    The federal court vacated Mr. Ligons' conviction and ordered that he be retried or released within 180 days.

44.    In April 2024, rather than face a retrial where the previously suppressed evidence would be available to the defense, Mr. Ligons accepted a guilty plea to third-degree murder.

45.    Mr. Ligons was released from prison on October 8, 2024, after serving 26.5 years for a crime he did not commit.

46.    At the time of his plea, Mr. Ligons was aware of the constitutional violations that occurred during his original prosecution, including the fabrication and suppression of evidence by Detective Gross and Detective Walter.

**The City's Pattern and Practice of Constitutional Violations**

47.    The constitutional violations committed against Mr. Ligons were not isolated incidents but were part of a longstanding policy, practice, or custom of the PPD Homicide Division of employing unconstitutional tactics in homicide investigations.

48.     For decades before and after Mr. Ligons' case, the City of

Philadelphia maintained policies, practices, and customs that encouraged,

condoned, or ratified constitutional violations in homicide investigations,

including: (a) fabricating inculpatory evidence; (b) suppressing exculpatory

evidence; (c) using physical coercion to obtain confessions; (d) providing

false testimony in court proceedings; and (e) failing to disclose material

evidence to prosecutors and defense attorneys.

49.     The City was deliberately indifferent to these constitutional violations

despite having actual or constructive notice of them through: (a) patterns of

overturned convictions; (b) civil rights lawsuits; (c) complaints of police

misconduct; and (d) media reports documenting systemic problems in the

Homicide Division.

50.     Detective Gross, who was central to the violations in Mr. Ligons'

case, was involved in other cases where similar constitutional violations

occurred, including the cases of Johnny Berry and Walter Ogrod, both of

whom had their convictions vacated due to police misconduct.

51.     Prior to 2014, the City failed to implement adequate policies

regarding: (a) the constitutional rights of suspects during interrogation; (b)

the prohibition of physical force during interrogations; (c) mandatory

recording of interrogations; and (d) the disclosure of exculpatory evidence to prosecutors.

52.  The City's deliberate indifference to these constitutional violations was the moving force behind Mr. Ligons' wrongful arrest, prosecution, conviction, and imprisonment.

## CAUSES OF ACTION

## COUNT I: VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS RIGHTS - FABRICATION OF EVIDENCE

(42 U.S.C. § 1983 against Detective Gross and Detective Walter)

53.  Mr. Ligons repeats and realleges the foregoing paragraphs as if fully set forth herein.

54.  Detective Gross and Detective Walter, acting under color of state law and within the scope of their employment, violated Mr. Ligons' rights under the Fourteenth Amendment to the United States Constitution by fabricating evidence against him.

55.  Detective Gross and Detective Walter fabricated evidence by providing false testimony under oath that photo arrays did not exist and were never shown to Ms. Johnson, when they knew such arrays existed and were in the homicide file.

56.    Detective Gross and Detective Walter knew this testimony was false when they gave it, or they provided it with reckless disregard for its truthfulness.

57.    The fabricated testimony was material to Mr. Ligons' prosecution because it prevented the defense from challenging the reliability of the eyewitness identification and presenting evidence that Ms. Johnson had not identified Mr. Ligons from photo arrays.

58.    There is a reasonable likelihood that, without the use of the fabricated evidence, Mr. Ligons would not have been convicted.

59.    Detective Gross and Detective Walter's conduct violated Mr. Ligons' clearly established constitutional right to due process of law.

60.    As a direct and proximate result of this violation, Mr. Ligons suffered the damages described herein.

**COUNT II: VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS RIGHTS - SUPPRESSION OF EXCULPATORY EVIDENCE**

(42 U.S.C. § 1983 against Detective Gross and Detective Walter)

61.    Mr. Ligons repeats and realleges the foregoing paragraphs as if fully set forth herein.

62.    Detective Gross and Detective Walter, acting under color of state law and within the scope of their employment, violated Mr. Ligons' rights under the Fourteenth Amendment by suppressing material exculpatory evidence.

63.    Detective Gross and Detective Walter suppressed the photo arrays that showed Ms. Johnson did not identify Mr. Ligons and may have identified someone else.

64.    This evidence was favorable to Mr. Ligons because it was exculpatory and impeaching of the key eyewitness's trial testimony.

65.    Detective Gross and Detective Walter deliberately withheld this evidence from prosecutors and defense counsel, and it remained suppressed for over a decade.

66.    The suppressed evidence was material because there is a reasonable probability that its disclosure would have resulted in a different outcome at trial.

67.    Detective Gross and Detective Walter's conduct violated Mr. Ligons' clearly established constitutional right to due process of law under Brady v. Maryland and its progeny.

68.    As a direct and proximate result of this violation, Mr. Ligons suffered the damages described herein.

## COUNT III: VIOLATION OF FOURTH AMENDMENT - EXCESSIVE FORCE DURING INTERROGATION

(42 U.S.C. § 1983 against Detective Gross, Detective Walter, Detective Lubiejewski, and John Does 1-10)

69.     Mr. Ligons repeats and realleges the foregoing paragraphs as if fully set forth herein.

70.     Detective Gross, Detective Walter, Detective Lubiejewski, and John Does 1-10, acting under color of state law and within the scope of their employment, violated Mr. Ligons' rights under the Fourth Amendment by using excessive force against him during his detention and interrogation.

71.     These defendants physically abused Mr. Ligons while he was in their custody, striking him in the face and causing him to sustain a black eye, orbital contusion, and bruises to his face and neck requiring medical treatment.

72.     The force used against Mr. Ligons was objectively unreasonable under the circumstances and was not justified by any legitimate law enforcement purpose.

73.     The force was used not to overcome resistance or prevent escape, but to coerce Mr. Ligons to make incriminating statements against his will.

74.    These defendants' conduct violated Mr. Ligons' clearly established constitutional right to be free from excessive force while in police custody.

75.    As a direct and proximate result of this violation, Mr. Ligons suffered the damages described herein.

## COUNT IV: VIOLATION OF FOURTH AMENDMENT - PROLONGED DETENTION WITHOUT PROBABLE CAUSE

(42 U.S.C. § 1983 against Detective Gross, Detective Walter, Detective Lubiejewski, and John Does 1-10)

76.    Mr. Ligons repeats and realleges the foregoing paragraphs as if fully set forth herein.

77.    Detective Gross, Detective Walter, Detective Lubiejewski, and John Does 1-10, acting under color of state law and within the scope of their employment, violated Mr. Ligons' rights under the Fourth Amendment by detaining him without probable cause.

78.    Mr. Ligons was arrested and detained based on fabricated evidence and an unreliable eyewitness identification that did not match his physical description.

79.    The photo array evidence, which these defendants suppressed, would have shown that there was no reliable eyewitness identification linking Mr. Ligons to the crime.

80.     Without the fabricated evidence and with disclosure of the

exculpatory photo arrays, there was insufficient probable cause to arrest and

detain Mr. Ligons.

81.     These defendants' conduct in fabricating evidence and suppressing

exculpatory evidence to support Mr. Ligons' continued detention violated

his clearly established Fourth Amendment rights.

82.     As a direct and proximate result of this violation, Mr. Ligons suffered

the damages described herein.

## COUNT V: VIOLATION OF FIFTH AMENDMENT - COERCED CONFESSION AND SELF-INCRIMINATION

(42 U.S.C. § 1983 against Detective Gross, Detective Lubiejewski, and John Does 1-10)

83.     Mr. Ligons repeats and realleges the foregoing paragraphs as if fully

set forth herein.

84.     Detective Gross, Detective Lubiejewski, and John Does 1-10, acting

under color of state law and within the scope of their employment, violated

Mr. Ligons' rights under the Fifth Amendment to the United States

Constitution.

85.     These defendants compelled Mr. Ligons to incriminate himself through physical coercion and abuse, in violation of his Fifth Amendment privilege against self-incrimination.

86.     Detective Gross and Detective Lubiejewski took Mr. Ligons' alleged confession, which was obtained through physical coercion and therefore involuntary.

87.     These defendants failed to honor Mr. Ligons' Fifth Amendment rights by using physical force and coercion to extract statements from him during custodial interrogation.

88.     Any statements obtained through such physical coercion were involuntary and obtained in violation of the Fifth Amendment's prohibition against compelled self-incrimination.

89.     The use of physical violence to coerce statements violated Mr. Ligons' clearly established Fifth Amendment rights that were well-settled at the time of the interrogation.

90.     As a direct and proximate result of this violation, Mr. Ligons suffered the damages described herein.

## COUNT VI: VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS RIGHTS - COERCED CONFESSION

(42 U.S.C. § 1983 against Detective Gross, Detective Lubiejewski, and John Does 1-10)

91.    Mr. Ligons repeats and realleges the foregoing paragraphs as if fully set forth herein.

92.    Detective Gross, Detective Lubiejewski, and John Does 1-10, acting under color of state law and within the scope of their employment, violated Mr. Ligons' rights under the Fifth and Fourteenth Amendments by using physical coercion to obtain statements from him.

93.    These defendants physically abused Mr. Ligons during his interrogation to coerce him to make incriminating statements against his will.

94.    Any statements obtained through such physical coercion were involuntary and obtained in violation of Mr. Ligons' constitutional rights to due process under the Fourteenth Amendment.

95.    These defendants' conduct violated Mr. Ligons' clearly established constitutional rights to be free from physical coercion during police interrogation.

96.    As a direct and proximate result of this violation, Mr. Ligons suffered the damages described herein.

## COUNT VII: CONSPIRACY TO VIOLATE CIVIL RIGHTS

(42 U.S.C. § 1983 against Detective Gross, Detective Walter, Detective Lubiejewski, and John Does 1-10)

97.     Mr. Ligons repeats and realleges the foregoing paragraphs as if fully set forth herein.

98.     Detective Gross, Detective Walter, Detective Lubiejewski, and John Does 1-10 reached an agreement or understanding to deprive Mr. Ligons of his constitutional rights under the Fourth, Fifth, and Fourteenth Amendments.

99.     These defendants agreed to and did: (a) fabricate evidence against Mr. Ligons; (b) suppress exculpatory evidence; (c) use excessive force and physical coercion against him; (d) compel him to incriminate himself in violation of the Fifth Amendment; (e) detain him without probable cause based on fabricated evidence; and (f) provide false testimony in court proceedings.

100.     These defendants took overt acts in furtherance of the conspiracy, including preparing and concealing the photo arrays, physically abusing Mr. Ligons during interrogation to coerce statements, and providing false testimony at trial.

101.    The conspiracy was formed and the overt acts were taken with the

specific intent to deprive Mr. Ligons of his constitutional rights under the

Fourth, Fifth, and Fourteenth Amendments.

102.    As a direct and proximate result of the conspiracy, Mr. Ligons

suffered the damages described herein.

## COUNT VIII: MUNICIPAL LIABILITY UNDER MONELL v. DEPT. OF SOCIAL SERVICES

### (42 U.S.C. § 1983 against City of Philadelphia)

103.    Mr. Ligons repeats and realleges the foregoing paragraphs as if fully

set forth herein.

104.    The City of Philadelphia, through its policymakers, maintained

policies, practices, and customs that violated Mr. Ligons' constitutional

rights under the Fourth, Fifth, and Fourteenth Amendments.

105.    These policies, practices, and customs included: (a) tolerating and

encouraging the fabrication of evidence in homicide investigations; (b)

failing to adequately train officers regarding constitutional requirements for

arrests, detention, and interrogations, including Fifth Amendment

protections against compelled self-incrimination; (c) failing to implement

adequate policies regarding the use of force during interrogations; (d) failing

to implement adequate policies regarding the disclosure of exculpatory

evidence; (e) failing to discipline officers who engaged in constitutional violations; and (f) maintaining a culture within the Homicide Division that prioritized convictions over constitutional compliance.

106.    The City's policies, practices, and customs were the moving force behind the constitutional violations Mr. Ligons suffered, including the fabrication of evidence, suppression of exculpatory evidence, use of excessive force, compelled self-incrimination, and detention without probable cause.

107.    The City acted with deliberate indifference to Mr. Ligons' constitutional rights by maintaining these policies, practices, and customs despite having actual or constructive notice of their unconstitutional nature.

108.    As a direct and proximate result of the City's policies, practices, and customs, Mr. Ligons suffered the damages described herein.

## DAMAGES

109.    As a direct and proximate result of Defendants' violations of his constitutional rights, Mr. Ligons has suffered and continues to suffer substantial damages, including but not limited to:

a. **Physical and Psychological Harm**: Severe physical injuries from the beating during interrogation; lasting psychological trauma from over twenty

years of solitary confinement on death row; ongoing mental anguish and emotional distress;

b. **Loss of Liberty**: Wrongful imprisonment for 26.5 years, including more than twenty years on death row in conditions of extreme isolation and deprivation;

c. **Loss of Life Experiences**: Missing his son's entire childhood and formative years; inability to maintain family relationships; loss of career opportunities; inability to participate in normal life activities;

d. **Economic Losses**: Lost earning capacity over 26.5 years; inability to accumulate assets or retirement savings; costs of reintegration into society;

e. **Reputational Harm**: Damage to reputation from wrongful conviction for murder; stigma associated with death row imprisonment;

f. **Pain and Suffering**: Physical pain from the beating and assault during interrogation; severe emotional distress from wrongful imprisonment; ongoing trauma from death row conditions; fear and anxiety associated with facing execution for a crime he did not commit.

110.    Mr. Ligons is entitled to compensatory damages in an amount to be proven at trial but not less than several million dollars.

111.    Mr. Ligons is entitled to punitive damages against the individual defendants for their willful, wanton, and reckless conduct in violating his constitutional rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Antoine Ligons respectfully requests that this Court:

a.  Enter judgment in favor of Mr. Ligons and against all Defendants;

b.  Award compensatory damages in an amount to be proven at trial;

c.  Award punitive damages against the individual defendants;

d.  Award pre- and post-judgment interest as allowed by law;

e.  Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

f.  Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

**MINCEY FITZPATRICK ROSS, LLC**

/s/ Kevin V. Mincey

Kevin V. Mincey

/s/ Thomas O. Fitzpatrick

Thomas O. Fitzpatrick

1650 Market St., 36th Floor

Philadelphia, PA 19103

215-587-0006

Date: August 12, 2025          ***Attorneys for Plaintiff***